**GREENBERG TRAURIG, LLP**
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932
(973) 360-7900
(973) 301-8410 (fax)
Attorneys for Plaintiff Doran Jones, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DORAN JONES, INC.<br><br>                              Plaintiff,<br><br>v.<br><br>PER SCHOLAS, INC., PLINIO AYALA,<br>and KEITH KLAIN,<br><br>                              Defendants. | CIVIL ACTION NO:<br><br>**COMPLAINT** |

Plaintiff Doran Jones, Inc., by way of its Complaint against Defendants Per Scholas, Inc.,

Plinio Ayala, and Keith Klain, hereby states and alleges as follows:

## INTRODUCTION

1.     This Action arises from the activities of Defendants Per Scholas, Inc. ("Per

Scholas"), Plinio Ayala ("Ayala") and Keith Klain ("Klain") to interfere with, devalue, and

destroy the software testing business of Doran Jones, Inc. ("Doran Jones") for commercial gain

and, in the case of Ayala and Klain, for personal gain.  Defendants took part in a series of

unlawful activities that caused serious and irreparable harm to the business of Doran Jones.  As

described more fully below, these unlawful activities included, among other things:

- purposeful efforts by the Defendants to sabotage the business of Doran Jones by
  improperly disclosing highly confidential trade secrets and other proprietary
  information;

- purposeful efforts by the Defendants to sabotage the business of Doran Jones by concealing unlawful disclosures, and by utilizing Klain improperly and unlawfully to collude with the officers and directors of Per Scholas, a competitor;

- purposeful efforts by the Defendants to sabotage the business of Doran Jones by improperly and deceitfully removing key provisions from agreements between the parties; and

- purposeful efforts by the Defendants to sabotage the business of Doran Jones by materially breaching contracts to damage the current and prospective business relationships of Doran Jones, and ultimately to acquire Doran Jones and/or its testing business at an artificially depressed price.

2.     Klain is a former co-CEO at Doran Jones who fostered and took advantage of an inappropriate personal relationship with Ayala, the President and CEO of Per Scholas and a member of its National Board of Directors, to the detriment of Doran Jones.   Together, Defendants took what should have been, and initially was, an arms-length negotiation between Doran Jones and Per Scholas on equal footing, and turned it into a calculated attempt to sabotage the testing business of Doran Jones, with Klain functioning as Per Scholas' operative within Doran Jones.

3.     Per Scholas is a non-profit organization and Doran Jones' partner in an initiative aimed at developing software testing jobs and training low-income urban residents and veterans to perform those jobs and establish IT careers, which Doran Jones anticipated would be lasting with upward career opportunities.   Doran Jones was responsible for developing the clients (several of whom Doran Jones had previously established, long-standing relationships with) and hiring out the testers, while Per Scholas was responsible for enrolling individuals in its training program and adequately training the potential testers.   As more fully described below, Per Scholas repeatedly and materially failed to meet its obligations to provide enough classes, enroll enough students, and provide the individuals with the appropriate training in the software testing

2

field such that Doran Jones could hire them into full-time positions that would satisfy the Doran Jones client base.

4.      Moreover, despite its non-profit status, Per Scholas has clearly set out, with Klain's help, to destroy and usurp Doran Jones' for-profit software testing business with the apparent goal of acquiring the for-profit business at an extraordinarily and artificially deflated price.  Such conduct, aside from giving rise to the causes of action asserted herein, is plainly inconsistent with Per Scholas' non-profit status and charitable mission.

5.      To achieve Defendants' goal, Klain and Ayala participated in a series of off-the-record exchanges of Doran Jones' confidential information without the permission of Doran Jones, and without its knowledge.  This conduct was a blatant attempt to: (1) provide Per Scholas with an unfair competitive advantage during the parties' negotiations; and (2) artificially devalue Doran Jones' business to either eliminate it completely and/or facilitate a purchase of the software testing business by Per Scholas at a severely depressed price, so that Klain could defect to Per Scholas.  Ultimately, Klain, after receiving directions from Ayala, surreptitiously changed a key provision in the parties' agreement for the benefit of Per Scholas, and did so without informing anyone at Doran Jones that the change was made, let alone requested.

6.      In furtherance of this unlawful conduct, Per Scholas, through Ayala, has repeatedly manufactured unsubstantiated and false alleged defaults under the agreements between Doran Jones and Per Scholas in an effort to destroy Doran Jones' business so that Per Scholas can purchase the software testing portion of the business, or simply acquire it through nefarious means.  Most recently, Per Scholas used these baseless allegations of default to deny Doran Jones' request to renew a sublease for the space in which Doran Jones operates some of its software testing and development business.

## PARTIES

7.      Plaintiff Doran Jones is a New Jersey corporation with offices located at 1200 Tices Lane, East Brunswick, New Jersey.

8.      Defendant Per Scholas is a Massachusetts non-profit corporation with offices located at 535 Egremont Road, Sheffield, Massachusetts.

9.      Defendant Ayala is an adult individual who, upon information and belief, resides at 1231 Lafayette Avenue, Bronx, New York.

10.     Defendant Klain is an adult individual who resides at 16 Copper Kettle Road, Trumbull, Connecticut.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 23 U.S.C. §§ 1331 and 1367.

12.     Venue is proper pursuant to the New York forum selection clauses contained in the parties' executed contractual agreements.

## FACTS

**Doran Jones' Business Relationship with Klain**

13.     Plaintiff Doran Jones is a New Jersey-based IT consulting company.

14.     In early 2014, Doran Jones sought to expand its business by entering into the field of software testing.  Doran Jones recognized an opportunity to earn revenue from its existing and potential clients for conducting sophisticated software testing while, at the same time, bringing sophisticated software jobs back to the United States and offering career opportunities to underprivileged individuals and veterans in urban areas.

4

15.     On February 13, 2014, Doran Jones extended an offer of engagement to Klain for the position of Managing Director and Chief Operating Officer of Doran Jones, with the intent that Klain would assist in the development of Doran Jones' software testing business and, more specifically, establish and manage Doran Jones' relationship with Per Scholas, the entity that would train the software testers that Doran Jones would ultimately hire.

16.     Before being hired by Doran Jones, Klain had developed a relationship with Ayala and had some discussions about the establishment of a software testing business using his then-existing business contacts. While Klain ultimately joined Doran Jones, he failed to bring any of his expected business with him.

17.     Pursuant to the February 13, 2014 offer of engagement, Klain's compensation was to consist of a salary of $300,000 per annum; annual bonuses based on the profitability of the company and at the discretion of the Board of Directors; and common shares of Doran Jones to be awarded based on his length of employment with the company.

18.     As a condition of his employment, Klain was also required to sign a "Non-Solicitation and Confidentiality Agreement" (the "Confidentiality Agreement").

19.     Paragraph 1 of the Confidentiality Agreement, entitled "Non-Disclosure of Confidential Information," provides in relevant part that:

> Employee shall not, during its engagement and thereafter for a period of ten years following its engagement (the "Confidentiality Period"), disclose, divulge, convey or use any Confidential Information or proprietary data of [Doran Jones] or any of its affiliates. "Confidential Information" includes all information, knowledge, or data relating to [Doran Jones], including, without limitation, client, customer and supplier lists, lists of employees and consultants, formulae, trade know-how, processes, secrets, consultant contracts, pricing information, marketing plans, product development plans, business acquisition plans, financial records, operational records, employment records and policies, and all other information relating to the operation of [Doran Jones] not in the

5

public domain or otherwise publicly available which are or were treated as confidential by [Doran Jones].

20.     Paragraph 8 of the Confidentiality Agreement, entitled "Non-Disparagement," provides that:

> Employee agrees that, during the course of Employee's service t[o Doran Jones] and at all times thereafter, Employee shall not for any reason whatsoever directly or indirectly, in any way comment (orally or in writing) negatively (even if true) about [Doran Jones], its principals, management, or any of its affiliates to any person or entity, or to disparage [Doran Jones] or any principal's affiliate's business or capabilities, plans or management to any client, media, competitor or any other individual or entity.

21.     Klain was named co-CEO of Doran Jones in June 2014, but his areas of responsibility and job duties did not change significantly.

**Klain's Misconduct and Repeated Breaches of the Confidentiality Agreement**

22.     Doran Jones terminated Klain's employment as co-CEO on January 28, 2016.

23.     Following Klain's termination from Doran Jones, a review of Klain's emails – including a selection of emails that Klain attempted to delete from his work account, as well as emails from his personal Gmail account – revealed that he had engaged in a variety of inappropriate, disloyal, and destructive practices during his time with the company.

24.     Upon information and belief, Klain's conduct was designed to: a) provide Per Scholas with unfair and anti-competitive advantages so that Per Scholas, or Ayala personally, could ultimately steal Doran Jones' business, and/or b) purposefully sabotage Doran Jones' business so that Per Scholas could purchase the software testing portion of the company at an extraordinary artificially low value, after which Klain would move to Per Scholas to run its software testing business alongside Ayala.

25.     Klain utilized his Doran Jones company computer to access confidential Doran Jones information and documents that he was not permitted to share with third parties.  Klain ceased to be an authorized user of his Doran Jones company computer when he began acting as an agent for Ayala and Per Scholas' benefit.

26.     Klain repeatedly utilized his Doran Jones work email account to engage in the unauthorized practice of sharing and sending confidential and proprietary Doran Jones information and documents.

27.     For example, on January 23, 2015, while Doran Jones and Per Scholas were negotiating a series of contracts to memorialize their sophisticated business relationship, Klain sent an email to Ayala from his work account that contained Doran Jones' full business plan and other highly confidential Doran Jones information.

28.     The information included, among other things, Doran Jones' operating budget for 2015, revenue, company salaries and expenses, and Doran Jones' pipeline of business at that time.  Remarkably, Klain conceded in his email that Doran Jones CEO Matt Doran ("Doran") and the Doran Jones Board of Directors "would have a fit if they knew" he had provided Ayala with this proprietary and confidential information.  Nonetheless, Klain shared this information with Ayala in violation of his Confidentiality Agreement.

29.     In turn, Ayala recognized the confidential and proprietary nature of the information and promised to keep it to himself.

30.     Upon information and belief, after receiving the information from Klain, Ayala represented that the Doran Jones business model was actually Per Scholas' business model, and used the business model in an attempt to secure funding from the Heron Foundation ("Heron").

31.     On August 31, 2015, Klain sent another email to Ayala from his work account containing highly confidential Doran Jones information, including, among other things, employee salaries and billing rates, amount of debt, and operating expenses.  Klain shared this information with Ayala in violation of his Confidentiality Agreement and with the goal of providing Per Scholas with an unfair advantage in the parties' relationship during a period of critical negotiations between Per Scholas and Doran Jones, rendering the possibility of fair, arms-length bargaining all but impossible.

32.     On October 1, 2015, Ayala and Klain corresponded with a consulting firm called Next Street, which performs due diligence for Heron, via email to create a business model for the software training program.  Doran Jones was not featured in the business model, and no other Doran Jones employees or Board members were consulted during the creation of the business model.

33.     Klain sent an email from his personal email account to Rodney Christopher, Heron's Director of Capital Markets, in which he stated that Doran Jones was facing severe financial difficulties.  Klain shared this information in violation of his Confidentiality Agreement and, more specifically, the Non-Disparagement provision contained therein.

34.     While Doran Jones received an initial grant from Heron, Klain and Per Scholas' actions have done grave damage to Doran Jones' relationship with Heron and have all but eliminated the opportunity for Doran Jones to obtain additional funding from Heron.

35.     As set forth more fully below, Klain also used his personal email account on numerous occasions to share confidential documents and conduct private, off-line negotiations with Ayala, which, upon information and belief, were solely for the benefit of Defendants and to the detriment of Doran Jones.

36.     Klain shared confidential Doran Jones financial information with Ayala and Per Scholas on numerous occasions indicating that the company was experiencing cash flow issues. This information was shared with Ayala and Per Scholas in breach of the Confidentiality Agreement.   Upon information and belief, Per Scholas used this confidential information as leverage during the parties' negotiations.

37.     Klain shared proprietary Doran Jones information with Michael Bolton, of DevelopSense, a Per Scholas partner that provides the testing program materials for the Per Scholas classes.   The proprietary information related to a software testing program that Doran Jones was building for its client, AQR Capital.   The software testing program that was being built at the time was confidential and trade secret information belonging solely to Doran Jones, and Klain was not authorized to share the information with anyone outside of Doran Jones.

38.     Upon information and belief, in January 2016, Klain shared confidential Doran Jones business information relating to a Doran Jones project to upgrade Medicare and Medicaid software nationwide (including, among other things, the company's business model and other documents) with Fiona Charles, an independent consultant. The Medicare and Medicaid project constitutes a significant potential business opportunity for Doran Jones, and Klain was not authorized to share the information with anyone outside of Doran Jones.

39.     Klain also caused Doran Jones to lose valuable business opportunities, both actual and potential, on several occasions.

40.     For example, on January 5, 2015, Viacom terminated its business relationship with Doran Jones.   Upon information and belief, Viacom's decision to part ways with Doran Jones was a direct result of Klain's inability, and, indeed, outright refusal, to address Viacom's business concerns, his unprofessional attitude, and his failure to show up at the client's work site.

41.     On November 17, 2015, Paul Holland, another Doran Jones employee, inquired via email on behalf of a potential client as to whether the company had anyone on staff who could teach Test Driven Development.  Klain falsely represented that Doran Jones did not have the capability to provide this service and, as a result, Doran Jones lost a business opportunity with potential revenues in the hundreds of thousands of dollars.

42.     A mere two weeks after advocating for the renegotiation of two contracts with Per Scholas that contained terms unfavorable to Doran Jones, Klain began utilizing his corporate and personal email accounts to apply for numerous job postings at competing companies during the work day.

43.     Klain repeatedly ignored directives from co-CEO Doran regarding media and publicity opportunities for Doran Jones, and repeatedly gave false and misleading information regarding the company and its prospects, all to the detriment of its current and prospective business relationships.

44.     Klain demonstrated open hostility to co-CEO Doran on numerous occasions, both via email and in person.

**Doran Jones' Initial Business Relationship with Per Scholas**

45.     Defendant Per Scholas is a Massachusetts-based non-profit corporation that specializes in IT workforce development.

46.     Upon information and belief, Klain and Ayala maintained a personal relationship even prior to Klain's hiring at Doran Jones.

47.     Recognizing that its software testing division could create hundreds of jobs in New York City for low-income urban residents and veterans, Doran Jones sought to partner with a non-profit organization to implement a job creation initiative and training program.

10

48.     Klain recommended that Doran Jones seek to establish that partnership with Per Scholas, and facilitated an introduction between the two companies.

49.     Based upon Klain's recommendation, Doran Jones sought to partner with Per Scholas in or around February 2014.   Development and management of this partnership remained Klain's primary, if not sole, responsibility throughout his tenure at Doran Jones.

**A.     The April 1, 2014 Training Agreement and the Sublease**

50.      Doran Jones and Per Scholas subsequently entered into a Training Agreement on April 1, 2014.

51.     Pursuant to Paragraph 1 of the Training Agreement, entitled "Lease," Per Scholas agreed to enter into a lease (the "Lease") for 15,000 square feet of space ("Space") on the second floor of its offices at 804 East 138th Street.  Per Scholas agreed to pay rent of $7.50 per square foot, subject to annual escalation of approximately 2.5% per year for a term of 10 years with the right to terminate after 5 years, and one renewal term of approximately 4 years.

52.     Pursuant to Paragraph 2 of the Training Agreement, entitled "Build-out," Per Scholas agreed to build-out (the "Build-Out") the Space in accordance with specifications to be agreed by the parties after obtaining possession of the Space.  The parties also agreed that the Build-Out was to be completed by October 1, 2014.

53.     Pursuant to Paragraph 3 of the Training Agreement, entitled "Sublease," Per Scholas and Doran Jones agreed to enter into a sublease (the "Sublease") of all of the Space simultaneously with Per Scholas entering into the Lease with all of the same terms and conditions of the Lease, except that rent would be increased by the Build-Out rent.  Doran Jones and Per Scholas subsequently executed the Sublease.

54.     Pursuant to Paragraph 4 of the Training Agreement, entitled "Courses," Per Scholas agreed to enroll a minimum of 20 students in each of a series of 8-10 week software testing courses (the "Courses"), the first of which would commence approximately 60 days before the Build-Out was completed.

55.     Pursuant to Paragraph 5 of the Training Agreement, entitled "Hiring," Doran Jones agreed to hire no fewer than 80% of the graduates from each Course until such time as 150 graduates in total were working full-time in Doran Jones' software testing business, assuming they were "fit for purpose."

56.     Pursuant to Paragraph 6 of the Training Agreement, entitled "Profit Sharing," and in consideration for Per Scholas' providing of trained individuals as set forth in Paragraph 4 of the Training Agreement, Doran Jones agreed to pay Per Scholas a share of the profits generated in its software testing business equal to 10% for the first year, 15% for the second year, and 25% for each year thereafter.

**B.**     **Repeated Delays in Completion of the Build-Out and Klain's Complicity**

57.     Per Scholas failed to complete the Build-Out of the Space by the agreed-upon deadline, October 1, 2014.

58.     Although the Build-Out was months from completion, Klain, who worked from the Space and was aware of the breach, nonetheless signed documents and a Sublease on behalf of Doran Jones to commit to a March 1, 2015 lease on February 5, 2015.

59.     On February 10, 2015, Klain agreed that Doran Jones would pay rent to Per Scholas for the months of January and February 2015, despite the fact that Doran Jones had not, and would not, have occupancy of the Space during that two-month time period.

60.     In reliance upon Per Scholas' representations that the Build-Out would be completed by February 28, 2015, Doran Jones scheduled a launch event on March 4, 2015, during which clients traveled from all over the United States to view the Space.  Per Scholas failed to meet its commitment, and the Space was not completed in time for the launch event.  As a result, Doran Jones suffered damage to its reputation and loss of credibility within the software consulting community.

61.     The Build-Out was not ultimately completed until July 2015.

62.     As a result of Per Scholas' failure to timely complete the Build-Out, Doran Jones lost business opportunities, revenue, and credibility within the consulting industry.

**First Default Letter from Per Scholas and Subsequent Renegotiations**

       **A.**     **Default Letter and Non-Binding Term Sheet**

63.     On April 14, 2015, Ayala sent a letter (the "Default Letter") to Doran and Klain indicating that Doran Jones had breached the Sublease by failing to make two rent payments totaling $29,923.96, along with a $18,750 security deposit, despite the fact that Per Scholas had not yet completed the Build-Out and, as a result, was essentially demanding rent for space that Doran Jones could not utilize to conduct its software testing business.

64.     The parties subsequently entered into a protracted period of renegotiations of the Training Agreement and Sublease between April 2015 and July 2015.

65.     As part of the negotiations, Per Scholas drafted a Non-Binding Term Sheet and presented it to Doran Jones on or around June 1, 2015.  Notably, the Non-Binding Term Sheet was drafted during the same time period in which Klain provided Per Scholas with confidential Doran Jones information.

66. The initial draft of the Non-Binding Term Sheet included several lopsided provisions that were intended to unfairly benefit Per Scholas and Klain.

67. For example, the Non-Binding Term Sheet included a section entitled "New Remedy," which stated that in the event of a breach or default by Doran Jones of either the Training Agreement or Sublease, Per Scholas would have the right:

> (i) to require [Doran Jones] to transfer to [Per Scholas] (free and clear of any and all liens, security interests or encumbrances) all of [Doran Jones'] interest in its software testing business, including all client and prospective client relationships relating to software testing and all contracts or contracts in negotiation for software testing and/or
>
> (ii) to engage in discussions, and/or make commitments, with Keith Klain and Paul Holland regarding possible employment with [Per Scholas] and/or other financial arrangements with [Per Scholas] (without [Doran Jones] having any right to make adverse claims against [Per Scholas] as a result of such discussions and/or commitments.)

In exchange for this transfer, Per Scholas suggested that Doran Jones would be released from any future liability for future rent under the Sublease, among other things.

68. The Non-Binding Term Sheet also included a section entitled "Early Termination Event," which provided that:

> In the event that Keith Klain for any reason ceases to be a full time employee of [Doran Jones], [Doran Jones] shall immediately notify [Per Scholas] and [Per Scholas] shall have the rights set out in clauses (i) and (ii) of the previous section entitled "New Remedy."

69. In sum, Per Scholas' initial proposed Non-Binding Terms Sheet created a condition wherein Klain's departure from Doran Jones – whether to go work for Per Scholas, to create his own business arrangement with Per Scholas, or to work for another company entirely –

would automatically trigger a requirement that Doran Jones turn over its entire software testing business to Per Scholas.

**B.**  **Klain and Ayala Conspire to Fix Negotiations in Per Scholas' Favor**

70.  During this negotiation period, Klain and Ayala engaged in a number of private conversations, via email, text message, and telephone, in which, upon information and belief, Klain, unlawfully and in breach of his duties to the company, provided Ayala with confidential information relevant to Doran Jones' position in the negotiations.

71.  For example, on April 15, 2015 – the same day on which Per Scholas sent Doran Jones the Default Letter – Klain and Ayala exchanged email correspondence in which Klain revealed to Ayala that Doran Jones' Board of Directors would be meeting the next day and that it was "do or die time" for the company.  Ayala requested that Klain call him after the meeting had taken place, and Klain indicated that Ayala would "be the first call" he made after the meeting.

72.  On April 22, 2015, Klain sent an email to Ayala from his personal account and attached, among other things, Doran Jones' confidential testing numbers, employee names, client names, and client prospects without the knowledge or permission of the Doran Jones Board of Directors.  Klain shared this information with Ayala in violation of his Confidentiality Agreement, and solely for the benefit of Defendants and the detriment of Doran Jones.

73.  On April 24, 2015, Ayala responded to Klain's personal email account with proposed changes and additions to Doran Jones' testing numbers, including, among other things, references to his/Per Scholas' finances and HR costs.

74.  That same day, Ayala requested that Klain provide him with additional confidential Doran Jones documents and information to be shared with the Per Scholas Board of Directors.

75.     Later, on June 4, 2015, as Doran Jones and Per Scholas were in the midst of negotiations relating to the Non-Binding Term Sheet, Klain and Ayala engaged in private discussions regarding an updated draft of the document before conferring with their respective Boards of Directors.

76.     On June 15, 2015, while negotiations between the companies continued, Klain emailed Ayala directly and requested that he "give [him] a call at home."  Ayala agreed and requested that Klain send him his home phone number.  Klain supplied his home phone number and, upon information and belief, Klain and Ayala engaged in discussions relating to the parties' negotiations without the input or permission of the Doran Jones Board of Directors, and in direct contravention of Klain's Confidentiality Agreement.

77.     Upon information and belief, Klain and Ayala conducted additional personal phone calls related to the negotiations between June 16 and 19, 2015.

78.     On June 25, 2015, Klain sent an email to Ayala containing additional confidential Doran Jones information relating to the company's business pipeline.

79.     Upon information and belief, Klain and Ayala also engaged in multiple private text message exchanges regarding the status of the parties' negotiations on or about July 7, 2015.

80.     On July 7, 2015, Klain informed Ayala via email that TD Bank had become a client and had entered into a contractual relationship with Doran Jones.  Upon information and belief, Ayala and Per Scholas used this confidential business information to their advantage in the ensuing negotiations because they knew that Doran Jones needed use of the Space and graduates of the software testing program to meet TD Bank's software testing needs.

81.     Just before the agreements were to be executed, Ayala shared Per Scholas Board notes with Klain that outlined Per Scholas' final negotiation points.  Klain did not share any of this information with Doran Jones or the Doran Jones Board of Directors.

82.     Thereafter, on July 13, 2015, Klain deleted key provisions contained in the "Expenses to Be Deducted" Schedule to the Amended Training Agreement that the parties were in the midst of negotiating, without input or approval from the Doran Jones Board of Directors.

83.     Specifically, Klain deleted the expenses for "UDC Test Analyst" – the expenses associated with the software testers – from the Schedule, which had the effect of virtually eliminating Doran Jones' software testing profits and rendering Doran Jones' business completely unprofitable.  The UDC Test Analyst expenses were contained in the parties' original Training Agreement, and were also included in the cost analysis exchanged between the parties during the negotiations.

84.     Klain was responsible for keeping Doran Jones and the Doran Jones Board of Directors apprised of changes to the agreements, which he failed to do.  Indeed, Doran and the Doran Jones Board members did not know about these surreptitious deletions, let alone agree to them, and Klain failed to provide Doran with the revised Schedules prior to execution.

85.     All of Klain's actions were taken in concert with Ayala in his capacity as President of Per Scholas, and all of Klain's actions directly benefited Defendants to the detriment of Doran Jones.  Indeed, the deletion of these expenses destroyed any profitability that Doran Jones had and vastly increased the portion of "profits" allocated to Per Scholas.

86.     On July 16, 2015, the parties executed an Amended and Restated Training Agreement ("Amended Training Agreement") and Amended and Restated Sublease ("Amended Sublease").

87.     Pursuant to the Amended Training Agreement, Doran Jones agreed, among other things: (1) to employ at least 40 Per Scholas graduates on a full-time basis by June 30, 2016, and, if the Sublease was renewed, employ at least 75 graduates by December 31, 2016; (2) to pay Per Scholas 25% of the profits generated through the software testing business or any other business in the Space beginning January 1, 2016; and (3) to execute and deliver to Per Scholas a note in the sum of $907,084, which represented some of the costs associated with the Build-Out of the Space.

88.     On July 29, 2015, Ayala invited Klain, via email, "for several drinks to celebrate our partnership."  Notably, although other Per Scholas employees were invited to the celebration, no other Doran Jones employees were included on this email exchange.

**Deficiencies in Per Scholas' Training Program**

89.     Doran Jones has met its obligations under both the Training Agreement and Amended Training Agreement by hiring the agreed-upon number of graduates from the Per Scholas training program.

90.     As described more fully below, the training program has been plagued with difficulties caused by Per Scholas.

91.     The attrition rates for students in the classes is shockingly high, with large numbers of the students enrolled failing to complete the course.

92.     Graduates of the training program have repeatedly failed to show up for job interviews and/or work, and have demonstrated a lack of proficiency in the software testing field.

93.     By way of example, Klain and Ayala repeatedly vouched for a particular graduate (the "Graduate") of Per Scholas' program, despite a documented propensity for tardiness, aggressive and bullying behavior, and general lack of interest in completing his software testing

work assignments.  Upon information and belief, Klain made assurances to the Graduate that he would receive a $10,000 raise, without permission from the Doran Jones Board of Directors.

94.     As a result of the Graduate and other graduates with similarly documented issues, Doran Jones has been forced to terminate many of the Per Scholas graduates it has hired.

95.     Doran Jones has made numerous attempts to suggest improvements to Per Scholas' training program, first through Klain and subsequently through Doran and others, but, despite Per Scholas' contractual obligation to take Doran Jones' suggestions in good faith, has been repeatedly rebuffed, and the program continues to have serious deficiencies.

96.     As a result of the documented problems with graduates from the Per Scholas training program, Doran Jones has lost current and prospective engagements with clients.

97.     Despite numerous demands from Doran Jones, Per Scholas has repeatedly failed to run a sufficient number of classes such that Doran Jones can satisfy its hiring obligations under the Amended Training Agreement.

98.     By way of example, on November 30, 2015, Kelly Richardson, Managing Director of Per Scholas, sent an email to Klain which clearly demonstrated that Per Scholas' proposed schedule of software testing classes in 2016 would not produce enough graduates to allow Doran Jones to meet its hiring obligations under the Amended Training Agreement.

99.     Upon information and belief, Per Scholas, at the direction of Ayala, purposefully maintained smaller than agreed-upon class sizes, and held classes on an insufficiently frequent basis to ensure that Doran Jones would not meet its hiring obligations.

**Second Default Letter from Per Scholas**

100.     In January 2016, Per Scholas approached Doran Jones with an offer to either invest in Doran Jones' software testing business, or acquire it outright.

19

101.    In a follow-up email to Doran dated February 7, 2016, Ayala reiterated his interest in purchasing the software testing business and requested specifically that Per Scholas be able to speak with Klain "as part of our due diligence process."

102.    In or around March 2016, Doran Jones responded to the Per Scholas offer to purchase the software testing business for a price that Doran Jones believed reflected the full value of the business it had built to date.  As an alternative, and consistent with the suggestion of Lewis Morris, the co-founder of Per Scholas, Doran Jones suggested that the parties agree to unwind their partnership.  Per Scholas declined both offers.

103.    On February 15, 2016, Ayala sent a Second Default Letter to Doran asserting that Doran Jones was: (1) in danger of breaching its obligation to hire the required number of graduates under the Amended Training Agreement; (2) in breach of the Amended Training Agreement because it had failed to provide Per Scholas with information requested pursuant to Sections 12 and 13 of the Amended Training Agreement; and (3) in breach of the Amended Sublease because it had failed to provide evidence of the required insurance under the Lease.

104.    On February 17, 2016, Doran replied via letter to Ayala and detailed the various steps that Doran Jones was taking to cure the alleged breaches.

105.    Doran Jones provided Per Scholas with the requested insurance documentation on February 26, 2016.

106.    Doran Jones also noted that it believed it was on track to meet its hiring obligations.  However, Doran Jones cautioned that if it could not hire the additional 16 required graduates, it was only due to the failure of Per Scholas to both: (1) adequately train course participants, and (2) commit to running enough training classes, with enough students enrolled, to allow Doran Jones to meet its obligations.

107.    On March 1, 2016, Ayala responded with another letter contending, among other things, that Doran Jones was at fault for any inability to hire the requisite number of graduates under the Amended Training Agreement and was "trying to shift the blame" to Per Scholas, despite a failure by Per Scholas to meet its own obligations under the Amended Training Agreement.

108.    Ayala falsely asserted that Doran Jones was in continuing breach of the parties' agreements when, as demonstrated above, Per Scholas was the breaching party.

**Third Default Letter from Per Scholas and Refusal to Renew Amended Sublease**

109.    On April 1, 2016, Ayala sent a Third Default Letter to Doran, in which he again indicated that Doran Jones was in breach of the parties' agreements because it would be unable to satisfy its requirement of having 40 full-time graduates of the course employed by June 30, 2016.

110.    Ayala also claimed that Doran Jones was solely responsible for meeting its hiring obligations under the Amended Training Agreement, even if Per Scholas had not produced enough qualified graduates from the training courses.

111.    By responsive letter dated April 1, 2016, Doran Jones indicated that it had several months to meet its hiring obligations and, therefore, the company could not possibly be in breach of its future June 30, 2016 obligations under the Amended Training Agreement.

112.    On April 1, 2016, Doran Jones requested a renewal of the Amended Sublease.

113.    On April 4, 2016, Ayala wrote to Doran Jones and indicated that Per Scholas would not renew the Amended Sublease because Doran Jones "is in breach of several obligations under the Training Agreement referenced in the Sublease," despite the fact that Doran Jones had

already cured the previously alleged breaches and has until June 30, 2016 – a date that has not yet arrived – to meet its hiring obligations under the Amended Training Agreement.

114.    Ayala falsely reiterated that Per Scholas was "not in breach of any of its obligations under the Training Agreement."

115.    Upon information and belief, Ayala has already begun preemptively marketing the Space to prospective tenants, despite Doran Jones' request to renew the Amended Sublease.

116.    Remarkably, Per Scholas is seeking to force Doran Jones out of the Space while, at the same time, attempting to enforce a Note that allegedly requires Doran Jones to pay for the improvements made to the Space, which Per Scholas had originally agreed to make.

117.    Doran Jones has created special clean/secure rooms in the Space to provide service to certain of its clients that require enhanced levels of cyber-security and data protection.

118.    To the extent that Per Scholas is allowed to wrongfully terminate the Amended Sublease, Doran Jones stands to suffer irreparable harm in that it will not have the time to establish the necessary alternative space for it to conduct is business and service its clients, including, without limitation, those clients that require enhanced levels of cyber-security and data protection.

**Per Scholas 2016 Annual Report**

119.    In or around April 2016, Per Scholas released its 2016 annual report ("Annual Report").

120.    As further evidence of the improper relationship between Klain and Per Scholas, the Annual Report contains a quotation from Klain, whom the document falsely, albeit tellingly, refers to as the "Co-creator" of the parties' job training program.

121.     In addition, the Annual Report makes clear that Per Scholas is pursuing a software testing business on its own, separate and apart from its relationship with Doran Jones.

122.     And, despite Per Scholas' April 1, 2016 contention that Doran Jones is in breach of the Amended Training Agreement because it will allegedly be unable to satisfy its hiring obligations by June 30, 2016, the Annual Report states that, to the contrary, Doran Jones "is hiring hundreds of Per Scholas Software Testing course graduates."

## COUNT ONE
### Violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, as Against Klain

123.     Doran Jones repeats and realleges the allegations set forth above, as if fully set forth herein.

124.     Klain knowingly, and with intent to defraud, exceeded his authorized access to a protected Doran Jones computer.

125.     Klain furthered the intended fraud by obtaining and sharing confidential Doran Jones information of value with Ayala and Per Scholas.

126.     Doran Jones suffered damage as a result of Klain's conduct.

## COUNT TWO
### Breach of Contract as Against Klain
### (Breach of Confidentiality Agreement)

127.     Doran Jones repeats and realleges the allegations set forth above, as if fully set forth herein.

128.     The Confidentiality Agreement is a valid and binding contract between Doran Jones and Klain.

129.     Doran Jones has substantially and materially performed under the Confidentiality Agreement.

130.    Klain has breached his contractual obligations to Doran Jones under the Confidentiality Agreement.

131.    As a result of Klain's breaches, Doran Jones has suffered damages.

## COUNT THREE
### Breach of the Duty of Good Faith and Fair Dealing as Against Klain

132.    Doran Jones repeats and realleges the allegations set forth above, as if fully set forth herein.

133.    Implied in Klain's confidentiality agreement is a duty to Doran Jones to act in good faith and conduct fair dealing.

134.    By way of the conduct described herein, Klain has breached his duty to act in good faith and conduct fair dealing.

135.    Doran Jones has suffered damages as a proximate result of Klain's breach.

## COUNT FOUR
### Breach of Fiduciary Duty as Against Klain

136.    Doran Jones repeats and realleges the allegations set forth above, as if fully set forth herein.

137.    Klain was at all times alleged herein an officer of Doran Jones.

138.    As an officer of Doran Jones, Klain owed fiduciary duties to the company.

139.    Klain knowingly and purposefully breached his fiduciary duties to Doran Jones by the acts and omissions described herein.

140.    Doran Jones has suffered damages as a result of Klain's breach of his fiduciary duties.

## COUNT FIVE
### Tortious Interference with Prospective Business Relations as Against all Defendants

141.    Doran Jones repeats and realleges the allegations set forth above, as if fully set forth herein.

142.    Doran Jones had business relations with multiple third parties, including, but not limited to, Heron Foundation, Angelo Gordon, Axiom, and Bank of America.

143.    Defendants interfered with those business relations by the acts and omissions described herein.

144.    Defendants acted with the sole purpose of harming Doran Jones and used dishonest, unfair, and improper means.

145.    Doran Jones suffered injury to its business relationships as a result of Defendants' interference.

## COUNT SIX
### Misappropriation of Trade Secrets as Against all Defendants

146.    Doran Jones repeats and realleges the allegations set forth above, as if fully set forth herein.

147.    Among other things, Doran Jones' business plan and the software program that Doran Jones built for AQR Capital constitute trade secrets that belong to Doran Jones.

148.    Klain disclosed Doran Jones' trade secrets to Per Scholas, Ayala and others and used those trade secrets in breach of his Confidentiality Agreement and in breach of his confidential relationship and fiduciary duty to Doran Jones.

149.    Per Scholas and Ayala knowingly and purposefully accepted Doran Jones' trade secrets and used those trade secrets to their advantage and to the detriment of Doran Jones.

150.    Doran Jones suffered injury as a result of Defendants' conduct.

## COUNT SEVEN
### Tortious Interference with Contractual Relations as Against Ayala and Per Scholas

151.     Doran Jones repeats and realleges the allegations set forth above, as if fully set forth herein.

152.     The Confidentiality Agreement is a valid and binding contract between Doran Jones and Klain.

153.     Ayala and Per Scholas knew of the existence of the Confidentiality Agreement between Doran Jones and Klain.

154.     Ayala and Per Scholas intentionally induced Klain to breach the Confidentiality Agreement.

155.     Doran Jones has suffered damages as a result of Ayala's tortious interference with the Confidentiality Agreement

## COUNT EIGHT
### Breach of Contract as Against Per Scholas
### (Breach of the Amended Training Agreement)

156.     Doran Jones repeats and realleges the allegations set forth above, as if fully set forth herein.

157.     The Amended Training Agreement is a valid and binding contract between Doran Jones and Per Scholas.

158.     Doran Jones has substantially and materially performed under the Amended Training Agreement.

159.     Per Scholas has breached his obligations to Doran Jones under the Amended Training Agreement.

160.     As a result of Per Scholas' breaches, Doran Jones has suffered damages.

## COUNT NINE
### Breach of the Duty of Good Faith and Fair Dealing as Against Per Scholas

161. Doran Jones repeats and realleges the allegations set forth above, as if fully set forth herein.

162. Implied in the Training Agreement and Amended Training Agreement is a duty imposed upon Per Scholas to act in good faith and conduct fair dealing.

163. By way of the conduct described herein, Per Scholas has breached its duty to act in good faith and conduct fair dealing.

164. Doran Jones has suffered damages as a proximate result of Per Scholas' breach.

## COUNT TEN
### Fraudulent Inducement as Against all Defendants

165. Doran Jones repeats and realleges the allegations set forth above, as if fully set forth herein.

166. Defendants made material misrepresentations and omitted material information to induce Doran Jones to enter agreements.

167. Doran Jones relied on the material misrepresentations and omissions in executing the agreements.

168. Doran Jones would not have executed the agreements but for the material misrepresentations and omitted material information.

169. Doran Jones has suffered damages as a result of Defendants' material misrepresentations and omissions.

## COUNT ELEVEN
### Declaratory Judgment in Favor of Doran Jones

170. Doran Jones repeats and realleges the allegations set forth above, as if fully set forth herein.

27

171.    Per Scholas has wrongfully alleged that Doran Jones has breached the Training Agreement and has wrongfully rejected Doran Jones' efforts to renew the Sublease.

172.    There is an actual controversy between the parties as to Per Scholas' allegations of breach and its ability to deny Doran Jones' efforts to renew the sublease.

173.    Doran Jones requests a Declaratory Judgment declaring that it is not in breach of the Amended Training Agreement and that its renewal of the Sublease is valid and enforceable.

**WHEREFORE,** Doran Jones demands judgment against Defendants:

(a) Awarding Doran Jones compensatory, statutory, and punitive damages;

(b) Declaring that Doran Jones is not in breach of the Amended Training Agreement and that its renewal of the Sublease is valid and enforceable;

(c) Enjoining Per Scholas from taking any actions inconsistent with Doran Jones' rights under the Amended Training Agreement and Sublease;

(d) Awarding Doran Jones its attorneys' fees, expenses, and costs of suit;

(e) Awarding Doran Jones equitable disgorgement of Klain's past compensation;

(f) Awarding pre- and post-judgment interest in accordance with applicable law; and

(g) Granting such other and further relief as may be just or proper.


Dated: April 15, 2016                         **GREENBERG TRAURIG, LLP**
                                              500 Campus Drive, Suite 400
                                              Florham Park, NJ 07932-0677
                                              (973) 360-7900

                                              By  *s/ Jason H. Kislin*
                                              Jason H. Kislin, Esq.
                                              Attorneys for Plaintiff Doran Jones, Inc.